## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **AUSTIN J RAPPUHN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **CIVIL ACTION NO. 20-00528-CG-N** |
| | ) |
| **PRIMAL VANTAGE COMPANY, INC.,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendant's motion for summary judgment (Doc. 120), Defendant's motions in limine to exclude expert testimony (Docs. 121, 122, 123, 124), Plaintiff's response to the motion for summary judgment (Doc. 129), Plaintiff's response to the motions in limine (Doc. 128), Defendant's reply in support of summary judgment (Doc. 135), and Defendant's reply in support of its motions in limine (Docs. 136, 137, 138).  For the reasons explained below, the Court finds that Defendant's motions in limine are moot as to Plaintiff's experts Stuart Statler and Stan V. Smith and should be granted in part as to Plaintiff's experts Guy Avellon and Dr. Jahan Rasty.  The Court also finds below that Defendants' motion for summary judgment should be granted in its entirety.

## FACTS

Plaintiff Austin J. Rappuhn filed this case seeking damages related to injuries he received while using a Primal Vantage PVCS-400 tree stand. (Doc. 1).

1

Plaintiff's complaint asserts three claims against Defendant Primal Vantage: 1) a claim for violation of Alabama Extended Manufacturer's Liability Doctrine alleging that the tree stand's defective and unreasonably dangerous condition proximately caused his injury, 2) a negligence claim based on Primal Vantage's failure to adequately engineer, design, manufacture, assemble, produce, supply, distribute, and sell the tree stand and its failure to adequately test, inspect and assure the quality of the tree stand, and to provide adequate warnings and instructions with the tree stand, and 3) a wantonness claim seeking punitive damages.  In his response to summary judgment Rappuhn withdraws his claims to the extent they are based on manufacturing or warning defects. (Doc. 129, PageID.5571).

The tree stand at issue, Model PVCS-400, is a climbing tree stand used for hunting at an elevated position in a tree. The tree stand has a foot platform and a seat platform which are moved independently up or down a tree in an inchworm like motion. The safety manual instructs the user how to secure the tree stand to a tree and to climb the tree by leaning against the "shooting rest" on the seat platform, lifting their feet to raise the foot platform - setting it in position, and then standing on the foot platform and lifting up on the seat platform to set it in a raised position.  This process is repeated until the desired height is reached. (Doc. 120-3, PageID.1858-1871).

The tree stand safety manual instructs the user to always use a "Fall Arrest System" harness after leaving the ground. (Doc. 120-3, pageID.1860).  The harness

is included with the purchase of the tree stand along with a manual instructing on the proper use of the harness. (Doc. 120-4, PageID.1872-1877; Doc. 120-6, PageID.2037).

The tree stand attaches to a tree using two steel cables with loops at the end that are inserted into the frame of the tree stand.  There are holes on the side of the platform where Quickclips are inserted to secure the cable. The cable loops for each side for both platforms are secured to the side of the platform using four Quickclips. (Doc. 120-3, PageID.18-62-1865).

On November 17, 2018, Plaintiff went hunting with his father. (Doc. 120-6, PageID.2008).  The weather was clear that day and it was during daylight hours. (Doc. 120-6, PageID.2009, 2020).  Plaintiff and his father split up and Plaintiff chose a tree and adjusted his cables, making sure that the pins were all locked and that they were through the loops of the cable. (Doc. 120-6, PageID.2009-2010, 2012).  The foot platform and the seat platform were tethered together with two straps. (Doc. 120-6, PageID.2012, 2015).  Plaintiff had used the tree stand before and had never had any operational problems with the Quickclips in the past. (Doc. 120-6, PageID.2014).  Plaintiff had his safety harness in his backpack and planned to put it on when he got to the height he wanted to hunt from up in the tree. (Doc. 120-6, PageID.2016).  Before he started up the tree Plaintiff checked the Quickclips by looking down at the clips on the foot platform and taking his hands and feeling the upper clips. (Doc. 120-6, PageID.2018).  Plaintiff started up the tree and had moved

3

the tree stand about two sequences and was sitting on the climbing bar when he heard a pop and the next thing he knew he was on the ground. (Doc. 120-6, PageID.2020, 2022).  Plaintiff was in the process of lifting the foot platform when he fell but he does not know if he had yet disengaged the foot platform or was moving it up yet. (Doc. 120-6, PageID.2021-2022).  Plaintiff does not really know how he fell.  He assumes he fell straight back, but the next thing he knew he was on the ground with his face in the mud and the seat platform wrapped around his body. (PageID.2022-2023, 2025).  Plaintiff does not remember how he came down, whether he did a flip, a half flip or how he landed. (Doc. 120-6, PageID.2028). Plaintiff thinks one of the Quickclips must have released but he does not know how that happened. (Doc. 120-6, PageID.2033).  The stirrups on the foot platform were damaged from the fall but nothing else on the tree stand was damaged, before or after the fall. (PageID.2024-2025).  The foot platform was still up on the tree after he fell. (PageID.2026).  Plaintiff tried to roll over but could not and so he started hollering for his father. (PageID.2029).

Plaintiff's father heard him call out and hurried over to him. (Doc. 120-12, PageID.2497).  According to Plaintiff's father, Plaintiff was lying face down with half of his face in the dirt on the ground with the upper part of the stand wrapped around his chest area. (PageID.2497, 2501-2502).  The foot platform was still up on the tree, about seven feet up, and was tilted with the right side down. (PageID.2497-2499).  Plaintiff's father testified that one of the pins was lying on the

4

ground and the cable was pulled out of the frame on the right side of the seat. (PageID.2504-2505).  The cable on the seat climber and the two Quickclip pins are still fully operational after the fall. (PageID.2507).

Alabama safety regulations require that when hunting on state land one must always wear a full body safety harness when using a tree stand from an elevated position. (Doc. 120-13, PageID.2574).  Plaintiff testified that he knows how to use a safety harness and had used them often before this accident. (Doc. 120-6, PageID.2058).  Plaintiff was aware before the accident that manufacturers of these types of stands recommend and warn people to use the safety harnesses. (Doc. 120-6, PageID.2058).  Plaintiff testified that he had heard stories that it was rather easy for the harness to get wrapped around your neck as you are climbing, and he thought it could have hung him or strangled him if he fell with it on while climbing. (Doc. 120-6, PageID.2034-2035).  However, Plaintiff understood that the tree stand industry and hunting industry warns and instructs that the harness should be utilized at all times once leaving the ground. (Doc. 120-6, PageID.2036).  Plaintiff admits that he did not need to be warned or instructed on how or when to use the safety harness because he already knew that. (Doc. 120-6, PageID.2059).  Plaintiff also admits that a tree stand by its nature is intended to be used at elevated heights and that there is an inherent risk of falling when using the product. (Doc. 120-6, PageID.2037).

Plaintiff's expert, Guy Avellon, concluded that the failure of the tree stand

5

was caused by "the failure to apply common engineering and safety standards and processes during the product's design and production." (Doc. 129-4, PageID.5650). Avellon found in his report that there was no physical means to verify that the tree stand cable is locked in position and no mechanical means or warnings provided to assure the Quickclip is properly fastened before a user begins to ascend a tree. (Doc. 129-4, PageID.5650).  The Quickclip allows the user to unknowingly not fully engage the clip, which can allow the clip to pop out during use. (Doc. 129-4, PageID.5649).  Avellon conducted no actual tests in this case. (Doc. 129-5, PageID.5659).  Avellon has never tried using a Quickclip himself. (Doc. 135-3, PageID.6423).  In fact, he has never physically touched a climbing tree stand and has only seen them used in videos he watched on YouTube. (Doc. 135-3, PageID.6423-6424).  In testimony, Avellon admitted that it is very easy to physically observe when the Quickclip is fully closed. (Doc. 135-3, PageID.6419). Avellon agreed that "it's a very open and obvious condition as to whether the Quickclip is properly closed" and "you can simply easily detect that visually looking at it," "if it's light outside, visually looking at it, it's really clear if it's closed or not." (Doc. 135-3, PageID.6422-6433; Doc. 137-2, PageID.7048).  Avellon also agreed that even in the dark you can feel whether it is properly closed. (Doc. 135-3, PageID.6438-6439).

Avellon also opined that there are better and safer types of fasteners that could have been used instead of the Quickclip to lock the tree stand cables into

place. (Doc. 129-4, PageID.5650).  A hex bolt with a wing nut or a carriage bolt with a wing nut could have been used. (Doc. 129-4, PageID.5649).  Avellon's report found that these alternative combinations would ensure full engagement and would not back out while climbing a tree. (Doc. 129-4, PageID.5649).  Avellon testified that these alternatives are either fully engaged or the user knows they are not fully engaged. (Doc. 129-5, PageID.5676-5677).  Avellon testified that other manufacturers use similar connectors with a knob and threaded fastener. (Doc, 129-5, PageID.5659).  When asked whether the Quickclip was as safe as the nut and bolt design Avellon testified that he could not say that it was as safe because the Quickclip failed in this case. (Doc. 135-3, PageID.6458).  Avellon agreed that with the nut and bolt design, as with the Quickclip, if the user does not properly utilize it there is a possibility it could fail. (Doc. 135-3, PageID.6485-6486).

Defendant admits that it would have been possible to have made the PVCS-400 tree stand used by Plaintiff with the nut/bolt alternatives instead of the Quickclips. (Doc. 129-13, PageID5986).  They are "just a different design option" and would not be "more expensive or unappealing to the consumer." (PageID5986-5987).

Plaintiff's expert, Dr. Jahan Rasty, concluded that the seat platform fell because the securement cable disengaged during use. (Doc. 129-7, PageID.5765, ¶ 48).  Rasty reports that as designed, it is possible for a user to incorrectly engage the Quickclip while under the misassumption that it is properly engaged (also

known as a false-latch position). (PageID.5765, ¶ 49).  According to Rasty, there was only one significant area of damage to the tree stand - in the form of overload failure and subsequent detachment of the foot straps from the frame of the foot platform of the tree stand. (PageID.5754-5755, ¶¶ 23, 25).  Rasty concluded that for the cable to have become disengaged during use without any signs of damage to any section of the cable the Quickclip that secures the cable to the frame must have become disengaged during use and that the incident occurred under a false-latch scenario. (PageID.5756, 5765, ¶¶ 30, 50).  Rasty suggested alternative latching mechanisms, such as a hex bolt with a wing nut, and a carriage bolt with a wing nut, that he opines would have prevented the unintended release of the securement cable if they had been used in place of the Quickclip. (PageID.5764-5766, ¶¶ 51-52).  According to Dr. Rasty's report, the bolt/nut combinations do not have a false-latch position and they cannot be removed by simply pulling on them and instead must be intentionally unscrewed before they can be removed. (Doc. 129-7, PageID.5764).  In testimony Dr. Rasty admitted that the alternative nut/bolt designs could still be installed wrong in that they may be only partially threaded by a user who could not tell how far it was threaded. (Doc. 120-7, PageID.2185).  However, Dr. Rasty contends that the Quickclip can fail if 12 to 19 pounds of force is applied even if it is perfectly implemented. (Doc. 120-7, PageID.2186).  Dr. Rasty testified that he does not know what the source of the force was – there are "a gazillion number of possibilities ... anything that could have caught that pin ... But what exactly caught

it? No, I can't tell you." (Doc. 120-7, PageID.2188). Dr. Rasty could not tell what

pulled the pin out of the Quickclip. (Doc.120-7, PageID.2156). Dr. Rasty did not test

the Quickclip pin with the product installed on a tree or with any load applied such

as the weight of a person that would be applied in normal use of the product. (Doc.

120-7, PageID.2135-2136, 2139-2140). According to his tests, it takes an average of

15.6 pounds and could be as low as 12.4 pounds of axial force to cause a closed

Quickclip to release. (Doc. 120-7, PageID.2157). Dr. Rasty testified that it would be

impossible to determine whether an article of clothing, a shoe, part of hunting

equipment or something else exerted the force that caused the pin to come out of the

Quickclip. (Doc. 120-7, PageID.2159). Dr. Rasty testified that the accident

happened either because Plaintiff did not close the clip properly or because he

closed it properly and some external force pulled the Quickclip out. (Doc. 120-7,

PageID.2154). Dr. Rasty did not consider that it occurred because Plaintiff fell

backwards because he said that was inconsistent with Plaintiff's testimony about

what happened. (Doc. 120-7, PageID.2154). Similarly, Dr. Rasty did not consider

that Plaintiff could have been attempting to remove the Quickclip to make an

adjustment when he fell – because, although that might have made a popping sound

like Plaintiff described, it is inconsistent with Plaintiff's testimony about what

happened. (Doc. 120-7, PageID.2134-2135). Dr. Rasty did not test whether the pin

would migrate when the tree stand was in use if the Quickclip was left open because

he believed that it was obvious that any vibration or movement of the cable as you

9

go up or down would cause the pin to come out. (Doc. 120-7, PageID.2167-2168). There are several possible scenarios under which the Quickclip could have released without any damage to the Quickclip or the tree stand. One is where the Quickclip did not fully engage the loop of the cable and then, through the motions of climbing, it slipped out. (Doc. 120-8, PageID.2237-2238). Dr. Rasty testified that he never demonstrated that happening. (Doc. 120-8, PageID.2238). It is also possible Plaintiff simply fell backwards out of the tree. (Doc. 120-8, PageID.2238). And then there is the false-latch possibility where Plaintiff inserts the cable into the frame of the tree stand but does not properly insert the Quickclip pin through the closed loop of the steel cable and during the climbing process the cable migrated out of the frame of the tree stand. (Doc. 120-8, PageID.2239). Additionally, part of Plaintiff's clothing could have caught on the pin and pulled it out. (Doc. 120-8, pageID.2240). All of these possibilities are "equally plausible" and Dr. Rasty cannot say with any certainty which occurred. (Doc. 120-8, PageID.2240).

Defendant's expert, Mr. George M. Saunders, Jr., found that it was impossible to determine if the Quickclip released at the time of Plaintiff's fall or if Plaintiff simply lost his balance and fell backwards, dislodging the Quickclip on the way out of the tree stand. (Doc. 120-5, PageID.1900, ¶ 48). Saunders pointed out that Dr. Rasty's conclusion that the clips were in a false-latch position contradicts Plaintiff's claim that he had checked the clips to ensure that they were properly engaged. (PageID.1900, ¶ 48). Saunders tested the possibility of pulling a properly

installed Quickclip free from the tree stand when the platform was supporting the weight of a user. (Doc. 120-5, PageID.1890, ¶ 31). When supporting a 205-pound user, the force required to initiate movement of the Quickclip from the tree stand was greater than 200 pounds and was more than 10.7 times higher than when the pin was not loaded. (PageID.1890, ¶ 31). Saunders also tested whether the pin would migrate out during use if the Quickclip were left open. In his open-Quickclip test, the pin did not migrate free or move while climbing up or descending. (Doc. 120-5, PageID.1891, ¶ 34). Saunders opined that because there are multiple possible scenarios which could have resulted in Plaintiff's fall, including Plaintiff having simply fallen backwards or his pants having caught the pin and pulled it out, it is not possible to determine what specifically occurred or to draw a conclusion with a reasonable engineering certainty that the incident was related in any way to the design of the product. (Doc. 120-5, PageID.1900-1901, ¶48).

Plaintiff's expert, Stuart Statler, opined that Primal Vantage did not demonstrate best practices and has repeatedly demonstrated "a corporate culture that holds the safety of its treestands in very low esteem." (Doc. 129-10, PageID.58-18, 5824). Defendant's expert, Saunders, reports that the PVCS-400 tree stand was tested per the ASTM F2120-26 standard for tree stands. The tree stand, including its cable assembly, Quickclips, and all other mechanical components, were cycle tested 10,000 times under 300 pounds of load and passed a thorough inspection after the cycle testing. (Doc. 135-1, PageID.6222, ¶ 43).

11

## DISCUSSION

### I. Motions in Limine

Defendant, Primal Vantage, moves to exclude or limit the testimony of Plaintiff's experts Dr. Jahan Rasty, Guy Avellon, Stuart Statler, and Stan V. Smith. (Docs. 121, 122, 123, 124). Plaintiff has voluntarily withdrawn the testimony of Stan Smith that was objected to by Primal Vantage. (Doc. 128, PageID.5012). Plaintiff states that he will not offer Dr. Smith's opinions and testimony relating to calculations of economic loss for the reduction in value to Plaintiff's life. (PageID.5012). Accordingly, Primal Vantage's motion in limine regarding Dr. Smith (Doc. 124), is **MOOT**.

Defendant objects to the testimony of Stuart Statler who was offered as a rebuttal expert and intends to opine that Primal Vantage failed to comply with safety regulations and industry standards in its development and production of the tree stand at issue. Mr. Statler's opinion has only been offered to support Plaintiff's claim that Primal Vantage was wanton by recklessly disregarding the safety of its tree stand products. (Doc. 129, PageID.5570-5571). Since the Court finds below that Plaintiff has failed to support his claim that a defect caused Plaintiff's injury, the Court finds the motion to exclude Mr. Statler's opinions will not change the outcome of this case and are **MOOT**.

As to the opinions of Avellon and Dr. Rasty, the Court finds it necessary to

12

exclude or limit portions of their opinions or conclusions. The Court will discuss the reliability of their testimony and opinions below as they pertain to the claims in this case.

## II. Motion for Summary Judgment

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving

that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice;

14

there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B. Plaintiff's Claims

As previously explained, Plaintiff's complaint asserts three claims against Defendant Primal Vantage: 1) a claim for violation of Alabama Extended Manufacturer's Liability Doctrine (AEMLD), 2) a negligence claim, and 3) a wantonness claim. Plaintiff has withdrawn his claims to the extent they are based on manufacturing or warning defects and maintains that the tree stand is defective in its design. (Doc. 129, PageID.5571).

### 1. Alabama Extended Manufacturer's Liability Doctrine (AEMLD)

"Under the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably safe for its intended purpose and use." *White Consol. Indus., Inc. v. Wilkerson*, 737 So. 2d 447, 449 (Ala. 1999) (quoting *Townsend v. General Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994)). "However, the

manufacturer of a product is not an insurer against all harm that might be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product." *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001) (citations omitted). "Likewise, the failure of a product does not presuppose the existence of a defect." *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1281 (M.D. Ala. 1998) (citation omitted). "Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." *Id.* (citation omitted).

To establish a prima facie case under the AEMLD, a plaintiff must show:

 [1] that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer; [2] that the seller was engaged in the business of selling such a product; and [3] that the product was expected to, and did, reach the user without substantial change in the condition in which it was sold.

*Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 31 (Ala. 2003) (citations omitted). There is no dispute that Primal Vantage was engaged in the business of selling the tree stand at issue or that the product was intended to and did reach Plaintiff without substantial change in the condition in which it was sold. However, the parties dispute whether Plaintiff's injury was caused by a defective condition that made the tree stand unreasonably dangerous to the user. "Caselaw in Alabama has interpreted 'defective' to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. *Shaver v. AVCO Corp.*, 2022 WL 4391677, at *5 (M.D. Ala. Sept. 22, 2022) (citing *Elliott v.*

*Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990)).  To prove that it is defective, a plaintiff must prove:

> (1) the product did not meet reasonable safety expectations and (2) that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the product.

*Id.* (citing *Elliott* supra).  Under the AEMLD, the plaintiff carries the burden of showing that there is a defect in the product. *Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (internal citations omitted).  Plaintiff claims the design of the tree stand was defective because the tree stand uses Quickclips to secure cables which are used to attach the product to a tree. Plaintiff asserts that the Quickclip fasteners are dangerous. Specifically, Plaintiff asserts that the Quickclips are capable of disengaging during use, even when fully and properly closed and that they may be "false-latched" such that a user may believe they are fully latched when they are not.

> To prove a safer, practical, and alternative design, a plaintiff must show:

> (a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
> (b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.

*Gen. Motors Corp.*, 883 So. 2d at 662 (citations and internal quotations omitted).  In the instant case, the evidence indicates that the Quickclip somehow disengaged or

released at the time of the accident. As previously mentioned, "[t]he fact that someone was injured while using a product does not establish that the product was unreasonably dangerous when put to its intended use." *Verchot*, 812 So. 2d at 301 (citations omitted).  A jury cannot infer "that a product is defective solely from the fact that it failed in some manner." *Taylor v. Gen. Motors Corp.*, 707 So. 2d 198, 202 (Ala. 1997).  Here, there have been several possible scenarios suggested that could have caused the Quickclips to disengage, some of which may not have been caused by any defect in the tree stand. For instance, Plaintiff could have improperly inserted the Quickclip, his pants or other loose clothing could have caught the Quickclip, or he could have simply fallen backwards. Where experts agree that other events could have caused the accident, the assertion that the accident was attributable to a defect "is necessarily speculative and nonselective and does not constitute substantial evidence indicating that [the alleged defect] caused the accident." *Verchot 812 So.2d at 301* (citation omitted)[1].  An expert's opinion cannot

---

[1] In *Verchot*, the Plaintiff alleged that the brakes on a car failed due to a defect in the master cylinder.
"Both of the mechanics who inspected the automobile for the plaintiffs stated in deposition that they could not say that an internal defect in the master cylinder was the only factor that could have caused the brakes in Verchot's automobile to fail as they did. They acknowledged other factors, such as excessive heat, leakage of brake fluid, and contamination of brake fluid, as possible causes. The affidavit of David Buist, the staff project engineer for General Motors, provided additional reasons that could have caused the brakes to fail, reasons that would not have depended upon an internal defect in the master cylinder."
*Verchot*, 812 So.2d at 303.

be "based on sheer speculation over the circumstances surrounding the issue upon which he or she purports to provide expert testimony." *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1283 (M.D. Ala. 1998). Plaintiff's experts disregarded these other causes because, although they were all plausible, they did not match Plaintiff's account of the accident. Plaintiff testified that he had made sure that the pins were locked and through the loops of the cable and that he checked the Quickclips by looking down at the clips on the foot platform and taking his hands and feeling the upper clips. Plaintiff also testified that he heard a pop sound before he fell. Plaintiff's account is evidence that he properly inserted the Quickclips and that something happened to make the pop sound before he fell. If we assume Plaintiff's testimony is accurate, then it is likely the Quickclip somehow disengaged on its own or was pulled out by some unknown force before he fell.

Plaintiff's expert, Avellon, opined that the tree stand was defectively designed because there was no way to verify if the Quickclip was properly fastened before a user begins to ascend a tree. However, Plaintiff testified that he properly installed the Quickclips and that he checked them by looking at them and feeling them to make sure they were properly installed. Plaintiff's expert, Avellon, admitted that it is very easy to physically observe when the Quickclip is fully closed and agreed that "it's a very open and obvious condition as to whether the Quickclip is properly closed." According to Avellon, a user can simply and easily detect whether a Quickclip is properly installed by visually looking at it if it is light

19

outside (as it was at the time of Plaintiff's accident) or by feeling whether it is properly closed.  Avellon admitted that it is really clear if it is closed or not. Avellon's testimony is contrary to his opinion that the tree stand was defective because there was no way to assure that the Quickclips were properly fastened. Accordingly, the Court finds Avellon's opinion that the tree stand was defective for this reason should not be allowed.

Plaintiff's expert, Dr. Rasty, opined that Plaintiff fell because either the Quickclip was in a false-latch position unbeknownst to Plaintiff, or a sufficient force was exerted to the Quickclip to release it.  Again, Plaintiff's testimony is that he checked the Quickclips to ensure that they were properly installed and the testimony of Plaintiff's expert, Avellon, indicates that Plaintiff would have been able to tell if the Quickclip was not properly installed because it is a very open and obvious condition.  As to Dr. Rasty's conclusion that the Quickclip could be released by a relatively small force, as little as 12.4 pounds, the Court finds his opinion does not have a reliable basis. Dr. Rasty did not test the tree stand with any load on it. When Plaintiff or any user was climbing with the tree stand the weight of the user would be on the tree stand.  "An expert's testimony must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.' " *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1283 (M.D. Ala. 1998) (citation omitted).  "While an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible

in evidence, Fed.R.Evid. 703, '[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert ... are [not] entitled to any weight when raised in opposition to a motion for summary judgment.' " *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1277 (M.D. Ala. 1999) (citation omitted). Primal Vantage's expert, Saunders, testified that when supporting a 205-pound person the force required to initiate movement of the Quickclip from the tree stand was greater than 200 pounds and was more than 10.7 times higher than when it was not loaded. Saunders' opinion is not contradicted by any of Plaintiff's experts because they did not provide any information on the amount of force needed to release the Quickclip when it is loaded with the weight of a user. There is no reliable evidence to support a contention that the tree stand was defective because the Quickclip could be pulled out by such a small force that it made it unreasonably dangerous.

As such, the Court finds there is no reliable expert testimony that indicates what caused Plaintiff's accident. "Conclusory allegations without specific supporting facts have no probative value." *Cooper*, 76 F. Supp.2d at 1278 (citation omitted). Plaintiff's memory of the incident points away from some of the potential causes but he admits that he does not really know or remember how he fell or how the Quickclip released. Since there have been several possible scenarios suggested that could have caused the Quickclips to disengage, some of which would not have been caused by any defect in the tree stand, the contention that the accident was

attributable to a defect is speculative.

Even if there was substantial evidence as to the cause of the accident, Plaintiff has not shown that his injuries would have been eliminated or reduced by use of an alternative design. There is evidence that a hex bolt with a wing nut or a carriage bolt with a wing nut could have been used instead of the Quickclips and that these alternatives were feasible, were of similar price, and were not unappealing to the consumer. However, although Plaintiff's expert, Avellon, opined that these alternatives were safer because the user knows when they are fully engaged, he also testified that, as with Quickclips, if the user does not properly utilize them there is a possibility it could fail. Dr. Rasty also admitted that the alternative nut/bolt designs could still be installed wrong in that they may be only partially threaded by a user, and they could not tell how far it was. And, as discussed above, Avellon admitted that it is very open and obvious and easy to detect whether the Quickclip is properly closed. Avellon's testimony indicates that he thought the Quickclip might not be as safe simply because the Quickclip failed in the instant case. But as discussed above, it cannot be concluded that a product is defective solely because the plaintiff was injured while using it. An expert's conclusion that a product is unsafe cannot be based simply on the fact that there was an accident when there are various potential causes.

Considering all of the above, the Court finds that Plaintiff has not met his burden of showing that Primal Advantage sold the tree stand in a defective

condition that made the product unreasonably dangerous to the ultimate user or consumer.  Accordingly, Primal Advantage is entitled to summary judgment as to Plaintiff's AEMLD claim.

## 2. Negligence & Wantonness

Plaintiff's negligence claim is based on Primal Vantage's failure to adequately engineer or design the tree stand. "Under Alabama law, negligence and wantonness claims are not subsumed by the AEMLD." *Shaver v. AVCO Corp.*, 2022 WL 4391677, at *7 (M.D. Ala. Sept. 22, 2022) (citing *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 106 (Ala. 2003)).  To support a negligence claim, "the plaintiff must establish not only that the product at issue is defective, but also that the manufacturer failed to exercise due care in the product's manufacture, design, or sale." *Id.* (citing *McMahon v. Yamaha Motor Corp.*, U.S.A., 95 So. 3d 769, 772 (Ala. 2012)).  Thus, "a plaintiff can only succeed on a products-liability claim on a negligence theory if the product at issue is sufficiently unsafe so as to render it defective." *Id.* (citing *McMahon supra*).  Since the Court found above that Plaintiff has not presented substantial evidence to show that the tree stand is sufficiently unsafe to render it defective, Plaintiff's negligence claim also fails.  Similarly, Plaintiff's wantonness claim fails "[b]ecause defective design or manufacture and proximate cause are essential elements of all theories being pursued." *McCreless v. Glob. Upholstery Co.*, 500 F. Supp. 2d 1350, 1358–59 (N.D. Ala. 2007); *see also Hughes v. Stryker Sales Corp.*, 2010 WL 1961051, at *7 (S.D. Ala. May 13, 2010),

aff'd sub nom. *Hughes v. Stryker Corp.*, 423 F. App'x 878 (11th Cir. 2011) (finding where "there is nothing other than idle speculation as to why" plaintiff's hips prosthesis failed the defendants are entitled to entry of summary judgment as to plaintiff's negligence and wantonness causes of action, as well).

**CONCLUSION**

For the reasons stated above, Defendant's motions in limine are **MOOT** as to Plaintiff's experts **Stuart Statler** and **Stan V. Smith** (Docs. 123 & 124) and are **GRANTED IN PART** as to Plaintiff's experts **Guy Avellon** and **Dr. Jahan Rasty** (Docs. 121 & 122) consistent with the Court's findings that portions of their testimony and conclusions are unreliable.  Defendant's motion for summary judgment (Doc. 120), is **GRANTED**.

**DONE** and **ORDERED** this 7th day of December, 2022.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

24